**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| DAVE EMERY, BRIGITTE EMERY, and KAMRAN SOLEIMANI, individually and on behalf of all others similarly situated, <br><br>    Plaintiffs, <br><br>   v. <br><br> ALSTON & BIRD, LLP; BANK OF AMERICA, N.A.; JPMORGAN CHASE BANK, N.A.; and COINBASE GLOBAL, INC., <br><br>    Defendants. | **CASE NO.** <br><br> CLASS ACTION COMPLAINT |

**CLASS ACTION COMPLAINT**

Plaintiffs, Dave Emery, Brigitte Emery, and Kamran Soleimani (together "Plaintiffs"), by and through undersigned counsel, bring this action against Defendants, Alston & Bird LLP ("Alston & Bird"); Bank of America, N.A. ("Bank of America"); JPMorgan Chase Bank, N.A. ("JPMorgan Chase"); and Coinbase Global, Inc. ("Coinbase") (collectively "Defendants"), and allege as follows:

**NATURE OF THE ACTION**

1.   This is an action against Alston & Bird, Bank of America, JPMorgan Chase, and Coinbase for aiding and abetting and enabling a massive Ponzi scheme orchestrated by Christopher Delgado through cryptocurrency investment firm, Goliath Ventures, Inc. ("Goliath"). Using joint venture agreements ("JVAs") and marketing materials, Delgado and his Ponzi scheme promoters (together "Goliath Conspirators") misrepresented to investors that they would use investor funds to make deposits into "crypto liquidity pools" and that investors would receive monthly returns generated from fees.

2.     In reality, the Goliath Conspirators lured investors into the scheme using JVAs drafted by, and a structure endorsed by, Alston & Bird. And the Goliath Conspirators used Goliath's accounts at Bank of America, JPMorgan Chase, and Coinbase to operate a classic Ponzi scheme. The Goliath Conspirators paid returns to investors using new investor money, raising as much as $328 million from at least 1,500 investors before the Department of Justice ("DOJ") arrested the Chief Executive Officer of Goliath, Delgado, on February 24, 2026.

3.     Defendants knew of and substantially assisted the Goliath Conspirators' scheme.

4.     Alston & Bird's participated in the scheme by drafting a legal opinion letter which Goliath used to justify its representation that the enterprise was not subject to the securities laws, when, in fact, it was. Further, Alston & Bird drafted the JVAs by which investor funds were solicited, transferred, and stolen. Alston & Bird knew that investors lacked access to internal information and would rely upon the integrity and independence of legal counsel structuring the enterprise. Despite this, Alston & Bird facilitated a structure riddled with conflicts, opacity, and foreseeable risk, while permitting investor-facing reliance upon its legal work product. Alston & Bird's misconduct was integral to the scheme to defraud investors.

5.     Likewise, Bank of America, JPMorgan Chase, and Coinbase knew of the scheme. Bank of America, JPMorgan Chase, and Coinbase's knowledge is bolstered by its "Know Your Customer" inquiries into the Goliath Conspirators. From the time of opening the Goliath Conspirators' accounts, Bank of America, JPMorgan Chase, and Coinbase knew that Goliath Conspirators were supposed to use investor monies to place into cryptocurrency liquidity pools, which would generate fees, which would be used to pay investor returns. Bank of America, JPMorgan Chase, and Coinbase monitored the Goliath Conspirators' accounts and saw that very little money going in and out of the Goliath Conspirators' accounts came from or went to

cryptocurrency liquidity pools. Instead, Bank of America, JPMorgan Chase, and Coinbase, saw investor funds commingled in the Goliath account, large sums being transferred from that account to repay other investors and misappropriated for purposes unrelated to the stated business model.

6. Despite this knowledge, Bank of America, JPMorgan Chase, and Coinbase, substantially assisted the Goliath Conspirators by allowing them to continue operating their accounts, commingle investor funds and make payments via wire, transfer and check. The Goliath Conspirators' financial activities at Bank of America, JPMorgan Chase, and Coinbase were integral to the scheme to defraud investors.

## JURISDICTION AND VENUE

7. This Court has jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), as this action is brought as a class action on behalf of class members, one or more members of the class are citizens of a state different than Defendants, and the amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs.

8. The Court has specific personal jurisdiction over Defendants because Plaintiffs' claims arise out of and relates to Defendants' unlawful conduct in Florida.

9. Venue is proper under 28 U.S.C. § 1391(b)(2) in this District because this District is where substantial events giving rise to the claims occurred.

## PARTIES

10. Plaintiff Brigitte Emery is an individual who resides in Dundas, Ontario, Canada.

11. Plaintiff Dave Emery is an individual who resides in Dundas, Ontario, Canada.

12. Plaintiff Kamran Soleimani is an individual who resides in Belle Isle, Florida.

3

13. Defendant Alston & Bird LLP is a limited liability partnership organized under the laws of the State of Georgia with its principal place of business in Atlanta, Georgia. Alston & Bird provides services to clients nationwide, including in Florida.

14. Defendant JPMorgan Chase, N.A., is a Delaware corporation with its principal place of business in Columbus, Ohio. JPMorgan conducts its business nationwide, including in Florida.

15. Defendant Bank of America, N.A., is a Delaware corporation with its principal place of business in Charlotte, North Carolina. Bank of America conducts its business nationwide, including in Florida.

16. Defendant Coinbase Global, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in San Francisco, California. Coinbase conducts its business nationwide, including in Florida.

### RELEVANT NON-PARTIES

17. Goliath is a Florida corporation formed by Delgado in 2019. Its principal place of business was in Orlando, Florida.

18. Delgado resides in Orange County, Florida, in home detention pursuant to the February 24, 2026 Order Setting Conditions of Release. Delgado controlled Goliath as its president.

19. Additional and unknown co-conspirators joined and assisted the Goliath Conspirators' fraud.

### FACTUAL ALLEGATIONS

**I.     The Goliath Ventures Ponzi scheme**

20. Delgado established Goliath in 2019, and served as the chief executive officer of the company. From 2019 until January 2026, the Goliath Conspirators raised at least $328 million

4

from at least 1,500 investors across the United States through a fraudulent cryptocurrency investment scheme.

21.     Goliath marketed itself as a private fund that invested in blockchain and cryptocurrency projects. To raise money from their victims, the Goliath Conspirators falsely represented to investors and prospective investors that their funds would be placed in cryptocurrency liquidity pools.  In exchange, the Goliath Conspirators promised victims they would receive consistent monthly returns of typically 3-8% per month, along with the return of their principal.

22.     The Goliath Conspirators solicited and raised money from investors by way of various means, including presentations, personal referrals, professional marketing materials, luxury events, and charitable sponsorships. Whatever the form of solicitation, the message was uniform: investor money would be placed in cryptocurrency liquidity pools where returns would be generated in the form of fees.  The returns would then be used to pay monthly returns to investors.

23.     The Goliath Conspirators entered into JVAs with each investor. Under Florida law, the JVAs created joint ventures, or partnerships, where each investor was a partner and joint venturer. Under the JVAs, Goliath Conspirators represented that "partner" funds would be deployed into liquidity pools and distribute returns on investments. Investors also gave Goliath sole discretion to make investment decisions on their behalf, including the discretion to change investment methods. Goliath's discretion could be based on market conditions, or on its own opinion that a different investment approach is more suitable for investors' money.

24.     The JVAs also included details about how Goliath would invest funds in liquidity pools and then distribute the returns from those liquidity pools to the investors.  Goliath told

5

investors that their money would move from a traditional bank account in Goliath's name to Coinbase, then to an encrypted ledger, and then to liquidity pools that would generate returns for them. The liquidity pools would run on one or more exchanges, such as Uniswap. Goliath included the below illustration of this investment cycle in its marketing materials:



**Fig. 1**

25.     Investors were offered the option to withdraw their monthly return or roll over monthly returns, increasing their account balances. The agreements guaranteed monthly returns ranging from 3-8% and/or guaranteed the return of an investor's principal.

26.     Investors could access their accounts through an online portal, which reflected their consistent purported monthly gains.

27.     According to the DOJ, the Goliath Conspirators received at least $328 million in investor funds from investors in Florida and several other states.  However, Goliath Conspirators

6

did not deposit investor funds in liquidity pools as promised, with the possible exception of approximately $1.5 million (or 0.46%).

28.     The Goliath Conspirators knew at the time they made the representations that the information provided in the investment materials, the JVAs, and the online portal were false. According to the DOJ, the investors' funds were neither used as promised nor used for any investment activity, with the possible exception of the approximately $1.5 million.   Instead, investor funds were primarily maintained essentially as cash in Goliath's accounts, including accounts at Bank of America, JPMorgan Chase, and Coinbase, instead of placed in liquidity pools.

29.     Instead of placing investor funds in liquidity pools, Delgado was using nearly all of those funds to pay for his lavish lifestyle and—in classic Ponzi-like fashion—using new investor funds to pay previous investors.

30.     Because the Goliath Conspirators placed less than 0.46% of investor money in liquidity pools and were diverting substantial investor money, the Goliath Conspirators were not earning anywhere near the revenue needed to pay the promised returns to investors.

31.     The reporting that Goliath provided to investors in its online portal and monthly statements was false. The reported returns were not generated from a liquidity pool or any investment activity.

32.     The only way the Goliath Conspirators could honor their obligations to investors would be through the successful continuation of their fraudulent scheme.  Once the supply of new victims was exhausted, the Goliath Conspirators would be unable to pay the promised returns to existing investors.

33.     In late 2025, the Goliath scheme began unfolding when Goliath began delaying payments to investors. On February 24, 2026, Delgado was arrested and charged with money

laundering and wire fraud in connection with Goliath. Payments to investors were suspended and investors have been unable to access Goliath's mobile application or funds.

34.     As a result of the Goliath Conspirators' uniform misrepresentations within the agreements, marketing materials, and online portal Plaintiffs and investors each reasonably believed their investments were placed into liquidity pools.  Had they known about the misrepresentations and omissions, they would not have invested.

## II.     The Goliath Conspirators had fiduciary duties to plaintiffs and the other investors

35.     The Goliath Conspirators had a duty to act for the benefit of Plaintiffs and class members upon matters within the scope of their relationship. Specifically, these Goliath Conspirators had a duty to place Plaintiffs' and class members' money in liquidity pools, as they represented they would, and deliver the returns to Plaintiffs and class members according to a set payment schedule.

36.     In addition, these Goliath Conspirators fostered a special relationship with Class Plaintiffs and class members that engendered fiduciary duties of loyalty, care, honesty and/or good faith.

37.     These Goliath Conspirators knew that investors, including Class Plaintiffs and class members, were relying on and trusting them to properly invest their hard-earned money.  They relied on and trusted these Goliath Conspirators, and these Goliath Conspirators knew and encouraged that reliance and trust.

38.     Indeed, as part of the JVAs, Goliath guaranteed repayment of investors' principal.

39.     Goliath also required investors, including Class Plaintiffs and class members, to sign confidentiality agreements promising not to disclose information about Goliath.

40.    Goliath marketed that its strategy involved active monitoring and risk management, including tools such as stop-loss mechanisms, slippage monitoring, and centralized exchange hedging.

41.    Investors entrusted the Goliath Conspirators with their money. Goliath took control over investors' funds and promised to invest it safely in liquidity pools.  Through the JVAs, investors also gave Goliath "sole discretion" to change or amend the investment methods on investors' behalf based on market conditions, or on Goliath's own opinion that a different investment approach is more suitable for investors' money.

## III.    Alston & Bird

42.    The Goliath Conspirators retained Alston & Bird as legal counsel.

### A.    Alston & Bird counseled Goliath that the scheme could operate outside the securities laws and without the attendant regulatory oversight

43.    The Goliath Conspirators informed Alston & Bird that they did not wish to limit fundraising to accredited investors or comply with the regulations surrounding the offer and sale of securities. The Goliath Conspirators sought an opinion that would allow Goliath to solicit funds broadly from individuals and entities without complying with securities registration, exemption, disclosure, or accreditation requirements.

44.    Alston & Bird knew or should have known that the substance of the liquidity pool arrangement was an investment contract under well-established federal law. Under the economic-realities framework articulated in *SEC v. W.J. Howey Co.*, an instrument constitutes a security where there is an investment of money in a common enterprise with an expectation of profits derived from the efforts of others.

9

45.     Moreover, under Florida law, a security includes, "[a]n investment contract," "[a] beneficial interest in title to property, profits, or earnings" and/or "[a]n interest in or under a profit-sharing or participation agreement or scheme."

46.     The Goliath structure involved precisely that: participants invested capital into a centralized liquidity pool; funds were commingled; profits were promised based on the enterprise's trading and lending strategies; and all meaningful managerial and operational control rested exclusively with the Goliath Conspirators. Labeling participants as "joint venturers" or "partners" did not alter the economic substance of the transaction.

47.     Despite this, Alston & Bird prepared an Opinion Letter addressing whether the proposed "liquidity pool" structure constituted a security. Despite the economic, structural, and practical realities of the contemplated transactions and returns, the Opinion Letter concluded that the structure would not implicate federal securities laws. Further, the Opinion Letter concluded that Goliath could raise capital from investors and channel those funds into a pooled enterprise through purported JVAs without triggering the regulatory obligations related to the offer and sale of securities.

48.     The Opinion Letter authored by Alston & Bird relied on the formalistic use of JVAs to characterize each participant as a "partner," rather than an investor. The JVAs repeatedly referred to capital contributors as "partners" and purported to grant them joint venture status. But the agreements conferred no meaningful managerial control, voting authority, or operational participation to the capital contributors. Participants functioned as passive investors whose returns depended entirely on the Goliath Conspirators' representations. As such, the arrangement satisfied the functional elements of an investment contract notwithstanding its nomenclature. What it did confer, however and as noted above, was a reasonable expectation by those "partners" of the joint

venture that their lawyer—the joint venture's lawyer, Alston & Bird—would fulfill the duties owed to the partnership. It did not.

49. Joint ventures ordinarily come in two forms. The first is where no entity is formed and two parties join for a common purpose. This is often called an "alliance." The other is where a more formal entity is formed and the parties are "partners."

50. Here, Alston & Bird created a joint venture with no entity—an alliance—except Alston & Bird also treated and in fact defined the investors as "partners," not joint venturers, to avoid the securities laws. However, for taxation purposes it was not treated as a partnership, as each purported "partner" received a 1099 for profits, not a K1.

51. In addition, it is nearly impossible to have a true joint venture for a liquidity pool investment which requires one party to invest money and the other to manage the money and do all the work. Indeed, in section 4.3 of the JVA, Goliath retained the ability to control "partner" investments, methods, or operation in its sole discretion.

52. Alston & Bird knew or should have known that a conclusion that the arrangement constituted a security would have required Goliath to either register the offering or strictly comply with exemptions that would significantly limit the pool of eligible investors and impose robust disclosure and compliance obligations.

53. By opining that the structure fell outside the securities laws, Alston & Bird created a structure to help Goliath solicit funds broadly without providing the protections mandated by federal and state securities regimes. It also provided legitimacy to an otherwise illegitimate structure.

54. Alston & Bird's legal advice was advantageous to Goliath because by following it, Goliath was ostensibly not subject to securities regulations and Goliath was able to expand the universe of potential investors.

55. In substance, the JVAs created a pooled enterprise in which investors contributed at least $328 million in capital that was managed exclusively by Goliath. By operating outside the securities-law framework with Alston & Bird's help, Goliath was able to operate without transparency, independent oversight, or mandated reporting, ultimately facilitating a massive Ponzi scheme that resulted in catastrophic losses to participants.

56. Alston & Bird learned of Delgado's and Goliath's fraud and breaches of fiduciary duties in the course of structuring, drafting, and validating the Goliath joint venture enterprise, including preparing the JVAs, subscription materials, and related legal documentation governing the investment program. Despite that knowledge, Alston & Bird substantially assisted the scheme by assisting Goliath and Delgado in circumventing securities laws, mischaracterizing investors as "partners," hiding the significant risks created by the investment structure, and giving comfort to prospective investors that the enterprise was a legitimate, financially sound investment that complied with all applicable regulatory and legal requirements.

57. But for Alston & Bird's opinion and structuring advice, the Goliath liquidity pool could not have been marketed and sold in the manner it was. The firm's conduct was a substantial factor in enabling the scheme to proceed and in causing the damages suffered by Plaintiffs and the Class.

**B.      Alston & Bird drafted the JVAs through which investors invested in the scheme**

58. Alston & Bird drafted the JVAs that governed investors' relationship with Goliath.

12

59.     Under the terms of the JVAs, Alston & Bird denominated each capital contributor as a "partner" in the enterprise with Goliath. To the extent the structure created a partnership or joint venture under applicable law, the duties owed by counsel to the joint venture enterprise extended to each of its partners. Alston & Bird undertook to structure and document the enterprise itself and to render legal opinions integral to its formation and capital-raising activities. In doing so, and particularly where its opinions were intended to induce investor reliance, Alston & Bird assumed duties not only to Goliath but also to the joint venture and its partners.

60.     Despite this fiduciary duty, Alston & Bird drafted JVAs that stripped the "partners" of the legal and regulatory protections that would normally apply to their investment, under state and federal securities frameworks.

61.     Alston & Bird also failed to disclose material conflicts of interest, structural weaknesses, and foreseeable risks inherent in the design of the Goliath investment program.

62.     By designing and documenting the investment structure while permitting investors and financial intermediaries to rely upon its legal work, Alston & Bird enabled a capital-raising scheme that ultimately resulted in hundreds of millions of dollars in investor losses.

63.     As a direct and proximate result of Alston & Bird's breaches of duty—including but not limited to negligent and/or knowingly improper legal opinions, structuring advice designed to circumvent securities protections, and the failure to recognize or disclose the securities-law implications of the arrangement—Plaintiffs and members of the Class were exposed to an unlawful and unsupervised capital-raising scheme. That exposure resulted in the loss of at least $328 million in invested funds, including substantial retirement savings placed at risk through self-directed IRA structures.

### IV.      JPMorgan Chase and Bank of America

64.      From approximately May 2025, the Goliath Conspirators used JPMorgan Chase and Bank of America as the primary banks to operate the Ponzi scheme.  Delgado had ultimate control over the accounts.

65.      During this same period, JPMorgan Chase and Bank of America saw the Goliath Conspirators use investor funds from the Goliath accounts maintained at JPMorgan Chase and Bank of America, respectively, for personal purchases.  The Goliath Conspirators also used investor funds deposited into these accounts to pay for luxury travel accommodations, and extravagant events.

66.      Federal law requires banks to "know their customers" and understand their customers' banking behavior.  Under applicable regulations, a bank must maintain procedures that allow it to "form a reasonable belief that it knows the true identity of each customer."  31 C.F.R. §§ 1020.220(a)(1), (2).  Thus, banks are required to collect information about the holder of each account.  Where an entity opens an account, the bank must obtain information concerning the individuals who control the account.

67.      Customer due diligence requires JPMorgan Chase and Bank of America to identify its customers, report indications of suspicious activity and assign a "customer risk rating." Customer due diligence requires JPMorgan Chase and Bank of America to know what business the customer is in, and to understand the types of transactions a customer should, and actually does, make. When monitoring its customers' accounts, JPMorgan Chase and Bank of America is obligated to comply with the Bank Secrecy Act ("BSA"), 31 U.S.C. § 5311 et seq., including regulations broadening its anti-money laundering provisions. The BSA requires JPMorgan Chase and Bank of America to develop, administer and maintain a program to ensure compliance.  The

14

programs must be approved by the respective bank's board of directors and noted in the board meeting minutes.  The programs must (1) provide for a system of internal controls to ensure ongoing BSA compliance, (2) provide for independent testing of the bank's compliance, (3) designate an individual to coordinate and monitor compliance and (4) provide training for appropriate personnel.

68.     JPMorgan Chase and Bank of America must also maintain a customer due diligence program to predict the types of transactions, dollar volume and transaction volume each customer is likely to conduct, thereby providing the bank with a means of identifying unusual or suspicious transactions for each customer.  The customer due diligence programs allow the banks to maintain awareness of the financial activity of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage.

69.     Customer due diligence programs should be tailored to the risk presented by individual customers, such that the higher the risk presented, the more attention is paid. Where a customer is determined to be high risk, banks should gather additional information about the customer and accounts, including determining: (1) purpose of the account; (2) source of funds; (3) proximity of customer's residence to the bank; and (4) explanations for changes in account activity.

70.     JPMorgan Chase, Bank of America, and the banks' respective personnel must be able to identify and take appropriate action once put on notice of any of a series of money laundering indicia set forth in the Federal Financial Institutions Examination Council's BSA/AML Examination Manual. These include: (1) repetitive or unusual fund transfer activity; (2) fund transfers sent or received from the same person to or from different accounts; (3) transactions inconsistent with the account holder's business; (4) transfers of funds among related accounts; (5) depositing of funds into several accounts that are later consolidated into a single master account;

(6) large fund transfers sent in round-dollar amounts; (7) payments unconnected to legitimate contracts or revenue sources; (8) fund transfers containing limited content or related party information; and, (9) an unusually large number of persons or entities receiving fund transfers from one company.

71.     Here, JPMorgan Chase and Bank of America engaged in a Know Your Customer analysis of the Goliath Conspirators and monitored the Goliath Conspirators' account for anomalous or suspicious behavior.  JPMorgan Chase and Bank of America collected and reviewed information about Goliath's business operations, the source of its funds and the purpose of its accounts.

72.     Further, Bank of America knows what its employees know.

73.     Likewise, JPMorgan Chase knows what its employees know.

74.     JPMorgan Chase and Bank of America understood Goliath's claimed business model: to raise money from investors and place it into liquidity pools to generate fees to repay investors.  JPMorgan Chase and Bank of America, therefore, should have seen banking activity consistent with this business model. That is, Goliath's banking activity should have reflected its receipt of investor funds, placement of those funds in liquidity pools, receipt of fees from the liquidity pools, and use of those funds to pay monthly returns to investors.  But that was not what JPMorgan Chase nor Bank of America saw.  Instead, the banks saw a great deal of investor money entering the Goliath account—and an array of other banking activities blatantly at odds with Goliath's claimed business model.

75.     Importantly, JPMorgan Chase and Bank of America knew that Goliath's account received *investor* funds.  Indeed, that was Goliath's entire business model.

16

76. Additionally, the deposits from investors and withdrawals out of the Goliath accounts at JPMorgan Chase and Bank of America were mostly round numbers, drawn on accounts of many different individuals and entities in Florida and across the country, which were followed by similar, round-number payments to those individuals or their affiliated entities.

77. JPMorgan Chase and Bank of America saw that little to no investor funds were deployed into liquidity pools.

78. As a further example of banking activity that conflicted with Goliath's business model, one would expect to see a regular flow of fees from the liquidity pools reflected in Goliath's account.  According to the DOJ, however, there were little to no fees generated from liquidity pools.

79. The DOJ examined the Goliath's bank account records (the same records available to JPMorgan Chase and Bank of America) and concluded that the transactional activity in the account was not consistent with their purported business models. Indeed, only a small portion (0.46%) of investor funds was possible placed in liquidity pools.

80. The JVAs are investment contracts. Investors looked solely to the Goliath Conspirators to produce returns, and the Goliath Conspirators' ability to do so depended entirely on their ability to either fund liquidity pools or attract new investors to cover payments to existing investors. JPMorgan Chase and Bank of America knew or willfully ignored that Goliath was raising considerable investor funds from thousands of investors but was not properly registered to sell securities or qualify for any exemption for the sale of securities.

81. Despite this knowledge of fraud, JPMorgan Chase and Bank of America failed to timely act upon the accounts connected with the Goliath Conspirators. JPMorgan Chase and Bank

17

of America continued to accept deposits of investor money and carry out the transfers needed to consummate the fraud.

82.     JPMorgan Chase and Bank of America's actions and inaction were integral to the scheme to defraud investors.  It was through JPMorgan Chase and Bank of America account transactions that the Goliath Conspirators applied new investor funds to pay existing investor returns, made cash withdrawals on investor funds and misspent investor funds.

83.     The Goliath Conspirators could not have carried out the scheme without first raising a large amount of funds from investors and then depositing and transferring those funds among bank accounts. The Goliath Conspirators' use of JPMorgan Chase and Bank of America accounts to commingle investor money enabled them to use new money to pay older investors, in classic Ponzi fashion, instead of funding payments fees generated from liquidity pools.

84.     Had JPMorgan Chase and Bank of America not knowingly and substantially assisted the scheme from its inception, and/or had closed the Goliath Conspirators' bank accounts early on, none of the Plaintiffs or other class members would have suffered damages.

85.     JPMorgan Chase and Bank of America benefitted from the Goliath Conspirators' continued use of their respective bank accounts, which generated JPMorgan Chase and Bank of America significant fees and the use of millions of dollars in deposits.

> **A.     JPMorgan Chase and Bank of America knew about the fiduciary duty owed to investors**

86.     JPMorgan Chase and Bank of America knew that the Goliath Conspirators owed fiduciary duties to victims.

87.     JPMorgan Chase and Bank of America, through their respective Know Your Customer inquiries, knew that these Goliath Conspirators had a duty to act for the benefit of Plaintiffs and class members upon matters within the scope of their relationship.  The Goliath

Conspirators had a duty to take Plaintiffs' and class members' money and place it in liquidity pools, and to collect fees and deliver the money to Plaintiffs and class members in accordance with the JVAs.

### V.      Coinbase

88.      As part of the Goliath scheme, investor funds were transmitted from traditional bank accounts, including accounts at JPMorgan Chase and Bank of America, to accounts maintained by Goliath at Coinbase. Once received at Coinbase, those funds were converted into digital assets, including stablecoins such as USDC. Following conversion, the digital assets were transferred from Coinbase accounts to external cryptocurrency wallets controlled by the Goliath Conspirators.

89.      Between 2023 and 2025, approximately $165 million in investor funds were transmitted to Goliath-controlled accounts at Coinbase. Of that amount, only approximately $1.5 million was deployed into actual liquidity pools or any legitimate cryptocurrency-based investment activity. The remaining funds were transferred to external wallets, redistributed to earlier investors, or otherwise misappropriated.

90.      In addition to receiving investor funds, Goliath's Coinbase accounts were used to transmit cryptocurrency to numerous individual Coinbase user accounts associated with investors. These outbound transfers were represented to investors as "returns" or "profits," and were used to reinforce the appearance of a legitimate and successful investment operation. Goliath executives and agents instructed investors to open Coinbase accounts specifically for the purpose of receiving these payments.

91.     As a result, both the inflow of investor funds and the outflow of purported returns occurred within Coinbase's ecosystem, providing Coinbase with visibility into both sides of the scheme's transactional activity.

### A.     The Goliath account exhibited activity inconsistent with stated business model

92.     Goliath represented that investor funds would be actively deployed into cryptocurrency trading strategies and liquidity pools. A legitimate operation of that nature would generate observable transaction patterns, including sustained trading activity, interaction with decentralized finance protocols, and inflows reflecting profits generated from those activities. The transaction activity within Coinbase's systems did not reflect such a business model.

93.     The expected intermediate step—deployment of assets into trading strategies or liquidity pools—was largely absent from the transaction activity observable within Coinbase's platform, indicating that funds were diverted before any legitimate investment activity occurred. Goliath's transaction activity included large and repeated inflows of funds, rapid conversion into digital assets, and near-immediate transfers to external cryptocurrency wallets.

94.     Goliath's transaction activity conducted through Coinbase's platform did not reflect patterns consistent with profitable cryptocurrency trading. The absence of sustained investment activity, combined with the rapid movement and dissipation of funds, is inconsistent with any legitimate asset management or trading strategy.

95.     A cryptocurrency investment operation of the type represented to investors necessarily requires sustained interaction with trading platforms or decentralized protocols; Goliath's transaction activity conducted through Coinbase's platform reflects no such activity.

96.     As a regulated financial intermediary, Coinbase maintains systems designed to monitor transaction activity and identify conduct indicative of fraud or misuse of customer funds, including activity inconsistent with the stated purpose of institutional accounts.

### B.     Coinbase's regulatory obligations and compliance framework

97.     Coinbase operates as a regulated financial intermediary subject to federal and state laws governing money transmission, anti-money laundering, and the prevention of financial crime, including the BSA and regulations administered by FinCEN.

98.     As part of its regulatory obligations, Coinbase is required to implement customer identification and due diligence procedures designed to understand the nature and purpose of customer accounts, including institutional accounts. These obligations require Coinbase to obtain and maintain information concerning the expected use of each account, including the source of funds, anticipated transaction activity, and the nature of the customer's business.

99.     Coinbase is further required to ensure that account activity remains consistent with the representations made in connection with the account and to identify discrepancies between expected and actual use.

100.     Coinbase is also required to maintain transaction monitoring systems designed to analyze account activity on an ongoing basis and to identify patterns indicative of fraud, misuse of funds, or other unlawful conduct. These systems are designed to evaluate not only individual transactions, but also broader patterns of activity, including the volume, frequency, structure, and flow of funds across accounts. Such monitoring necessarily involves the identification of activity inconsistent with a customer's stated business model, including the absence of legitimate investment activity where such activity is represented.

21

101.    Under the BSA and related regulations, Coinbase is required to identify and investigate suspicious activity, including transactions that lack apparent lawful purpose or are inconsistent with expected account activity. These obligations include identifying patterns such as large inflows of funds followed by rapid transfers, limited retention of assets, and the redistribution of funds without underlying economic activity.

102.    Where such activity is identified, Coinbase is required to investigate and, where appropriate, report such activity to regulators.

103.    Goliath's transaction activity—including the receipt of investor funds, conversion into digital assets, transfers to external wallets, and the redistribution of funds as purported returns—occurred within accounts maintained on Coinbase's platform. This activity was required to be monitored, evaluated, and assessed by Coinbase as part of its ongoing compliance obligations.

104.    The nature of Goliath's activity, when considered in light of the expected use of an account representing a cryptocurrency investment operation, reflects a discrepancy between stated purpose and actual use that Coinbase's systems are designed to identify.

105.    Because Coinbase was required to obtain information concerning the nature and purpose of the Goliath accounts, and to monitor the transaction activity conducted through those accounts, it necessarily possessed the information needed to evaluate whether that activity was consistent with a legitimate investment operation.

106.    Coinbase therefore knew of the nature of the transaction activity conducted through its platform, including that Goliath was using new investor funds to pay purported returns to existing investors.

22

**C.      Coinbase was required to monitor Goliath's account activity**

107.    Coinbase operates as a financial intermediary that maintains systems designed to monitor account activity, record transactions, and identify unusual or suspicious patterns. Coinbase maintains records reflecting deposits, conversions, transfers, and balances associated with customer accounts. Coinbase is required to implement and maintain systems designed to identify transactions inconsistent with the stated nature and purpose of customer accounts.

108.    Coinbase had the ability to restrict, delay, or otherwise control the movement of digital assets within its platform, including the transfer of assets to external wallets. Coinbase therefore possessed both visibility into and control over the conduct at issue.

109.    Coinbase's monitoring systems are specifically designed to detect activity indicative of fraud, including inconsistencies between expected and actual account usage, and patterns reflecting the recycling or redistribution of assets without legitimate economic purpose.

110.    These systems provide Coinbase with the ability not only to observe suspicious activity, but also to investigate, flag, and take action in response to such activity, including restricting transactions, reviewing account behavior, and preventing further misuse of its platform.

111.    In circumstances where both the inflow of investor funds and the distribution of purported returns occur within Coinbase's platform, Coinbase's systems provide a comprehensive view of the transaction lifecycle, enabling the identification of circular fund flows and other patterns uniquely indicative of fraudulent investment schemes.

**D.      The Goliath account exhibited indications of fraud**

112.    The transaction patterns present in the Goliath accounts exhibited multiple indicia of fraud and misappropriation, including:

      a.      large and repeated inbound transfers of funds from multiple sources;

      b.      rapid conversion of fiat currency into digital assets;

23

c.      near-immediate outbound transfers to external wallets;

d.      lack of meaningful trading or investment activity; and

e.      absence of corresponding inflows reflecting investment returns.

113.    These patterns are widely recognized as indicators of fraudulent activity, including Ponzi schemes and misappropriation of funds.

114.    The use of a centralized account to receive large volumes of investor funds and then distribute payments to numerous individual user accounts is a hallmark of Ponzi schemes and other fraudulent investment operations.

115.    The transaction activity also exhibited a closed-loop pattern in which funds deposited into Goliath's Coinbase accounts were subsequently redistributed to other Coinbase user accounts as purported returns, without any intervening profit-generating activity. Such circular movement of funds, absent legitimate economic output, is a defining characteristic of Ponzi schemes.

116.    In combination, the volume, velocity, structure, and repetition of these transactions created a pattern that was not merely suspicious, but unmistakably inconsistent with any legitimate cryptocurrency investment operation and uniquely indicative of systematic misappropriation of investor funds.

### E.      Coinbase's knowledge of Goliath's scheme

117.    The discrepancy between Goliath's stated business model and the transaction activity observable within Coinbase's systems was substantial and persistent.

118.    Coinbase observed the rapid inflow and outflow of funds, the absence of legitimate investment activity, and the lack of corresponding returns. These patterns were inconsistent with the operation of a legitimate cryptocurrency investment program and indicative of misappropriation and fraud. The only reasonable inference from the transaction activity observable

24

within Coinbase's platform is that Coinbase knew that Goliath was not operating a legitimate cryptocurrency investment program.

119. Coinbase's own public disclosures confirm its awareness that cryptocurrency platforms are susceptible to fraud and misuse, and that transaction monitoring is necessary to identify and prevent such conduct. The transaction patterns described herein fall squarely within the risks that Coinbase has acknowledged.

120. Because both the receipt of investor funds and the distribution of purported returns occurred within Coinbase's platform, Coinbase had direct visibility into the circular flow of funds characteristic of a Ponzi scheme.

121. The combination of (i) large inbound transfers, (ii) rapid outbound transfers to external wallets, and (iii) repeated distributions to Coinbase user accounts, created a transaction pattern that is uniquely indicative of fraudulent investment activity and could not have been missed by a platform with Coinbase's monitoring capabilities.

### F. Coinbase aided and abetted Goliath's scheme

122. Despite the presence of these indicators, Coinbase continued to process transactions on behalf of Goliath, including the conversion of investor funds into digital assets and the transfer of those assets to external wallets.

123. Without Coinbase's services, Goliath could not have converted investor funds into digital assets at the scale alleged or transferred those assets in the manner required to sustain the scheme. By continuing to provide these services in the face of clear indicators of misconduct, Coinbase enabled the operation and continuation of the Goliath scheme.

124. Coinbase actively facilitated the conversion and rapid dissipation of investor funds in a manner that allowed the scheme to function and evade traditional financial oversight.

125. Coinbase's platform also enabled the distribution of purported "returns" to investors through transfers to other Coinbase user accounts, thereby reinforcing the appearance of a legitimate and profitable investment operation and encouraging continued inflows of investor capital.

126. By facilitating both the conversion of investor funds and the internal redistribution of those funds as purported profits, Coinbase provided the infrastructure necessary not only to execute the scheme, but to sustain it over time by maintaining investor confidence.

## VI.   Plaintiffs invested in the scheme and suffered substantial losses

### A.   Plaintiffs Brigitte and Dave Emery

127. Between March 2024, and January 2025, Plaintiffs Brigitte and Dave Emery invested approximately $220,200 with Goliath. Plaintiffs Brigitte and Dave Emery (the "Emerys") are a married couple and jointly invested their funds into Goliath.

128. Dave Emery learned of the opportunity to invest in the venture from Vince Gratta, an insider who worked directly for Goliath. Gratta represented to the Emerys that their "investment total [was] guaranteed."  The Emerys relied on those representations made in deciding to invest.

129. On or about May 28, 2024, Dave Emery entered into a written JVA with Goliath. On or about December 7, 2024, Delgado executed the agreement on behalf of Goliath Ventures. The agreement stated that Dave Emery would contribute funds for placement into liquidity pools and that it would be entitled to monthly interest from its contribution. Through the agreements, Goliath guaranteed the return of the Emerys' principal contribution. Goliath also guaranteed that if the Emerys elected to withdraw some or all its investment, Goliath would process the withdrawal request within a 24-to-72-hour period.

130.   On or about May 25, 2024, per Goliath's instructions, the Emerys wired $50,000 to Goliath's JPMorgan Chase account. On July 2, 2024, the Emerys wired $25,000 to the same account. On July 27, 2024, the Emerys wired $22,200 to the same account. On January 9, 2025, the Emerys wired $95,000 to the same account. In total, the Emerys invested $220,200 in Goliath. The Emerys also elected to reinvest certain distributions, amounting to $28,000 in additional investments.

131.   Beginning in or after 2024, the Emerys received distributions amounting to $103,525, in total.

132.   During the period he was making investments, the Emerys were never informed of the true nature of how Goliath and Delgado were using his money. Had he known the truth, the Emerys never would have invested in Goliath.

133.   The losses the Emerys has incurred have caused hardship to them and their family.

**B.    Plaintiff Kamran Soleimani**

134.   In as early as December 2024, Plaintiff Kamran Soleimani began investing with Goliath Ventures.

135.    Soleimani learned about the investment opportunity from Delgado and multiple insiders who worked directly for Goliath, including but not limited to, Steven Davis, Michael Cmielewski, and Nick Petrillo. Soleimani relied on those representations made in deciding to invest.

136.   On or about December 2, 2024, Soleimani entered into a written JVA with Goliath. The agreement stated that Soleimani would contribute funds for placement into liquidity pools and that it would be entitled to monthly interest from its contribution. Specifically, Soleimani was to wire funds for investment to a JPMorgan Chase account maintained by Goliath. Through the

agreements, Goliath guaranteed the return of Plaintiff Soleimani's principal contribution. Goliath also guaranteed that if Soleimani elected to withdraw some or all its investment, Goliath would process the withdrawal request within a 24-to-72-hour period. On or about June 25, 2025, the agreement was modified to require Soleimani to wire funds for investment to a Bank of America account maintained by Goliath.

137.    Soleimani invested a total of $658,882.06 in Goliath. This included an investment in May 2025, where Soleimani wired $385,000 to a JPMorgan Chase account maintained by Goliath, and another investment in August 2025, where Soleimani wired $240,000 to a Bank of America account maintained by Goliath.

138.    During the period he was making investments, Soleimani was never informed of the true nature of how Goliath and Delgado were using his money. Had he known the truth, Soleimani never would have invested in Goliath.

139.    The losses Soleimani has incurred have caused hardship to Soleimani and his family.

## TOLLING OR NON-ACCRUAL OF STATUTES OF LIMITATIONS

140.    Plaintiffs and the Class did not and could not have discovered the facts constituting Defendants' unlawful conduct until February 24, 2026, when Delgado was arrested and charged with money laundering and wire fraud.

141.    Because Plaintiffs and Class members could not have reasonably discovered the facts constituting Defendants' unlawful conduct until February 24, 2026, their claims accrued on that date and any applicable statutes of limitations were tolled until that date.

28

## CLASS ACTION ALLEGATIONS

142. Plaintiffs bring this action individually and on behalf of a class of similarly situated persons pursuant to Rule 23 of the Federal Rules of Civil Procedure.

143. Plaintiffs bring this action on behalf of themselves and the following class:

All persons and entities who invested funds pursuant to Joint Venture Agreements with Goliath and suffered losses as a result of the Goliath investment program.

144. Plaintiffs bring this action on behalf of themselves and the following JPMorgan Chase subclass:

All persons whose investment funds were transmitted to, deposited into, or routed through JPMorgan Chase accounts maintained for or used by Goliath.

145. Plaintiff Soleimani brings this action on behalf of himself and the following Bank of America subclass:

All persons whose investment funds were transmitted to, deposited into, or routed through Bank of America accounts maintained for or used by Goliath.

146. Plaintiffs bring this action on behalf of themselves and the following Coinbase subclass:

All persons whose investment funds were transmitted to, deposited into, or routed through Coinbase accounts maintained for or used by Goliath.

147. Excluded from the class and subclass definitions are 1) Defendants and any of their current or former officers, directors, employees, agents, or representatives; 2) any judge or magistrate assigned to this action, members of their staff, and any members of their immediate families; and 3) any person or entity whose total withdrawals, redemptions, or payments from the Goliath investment program exceeded the total amount of that person or entity's invested principal (i.e., "net winners").

29

148.     Plaintiffs reserve the right to modify or amend the Class definitions as discovery and further investigation may warrant.

149.     Numerosity. The members of the Class and subclasses are so numerous that joinder of all members is impracticable. Public filings in the criminal case against Delgado and related investigative materials indicate that Goliath raised hundreds of millions of dollars from thousands of investors across multiple jurisdictions. The identities of many Class members are presently known only to Defendants and third-party custodians, including financial institutions and self-directed IRA custodians that processed investor funds.

150.     Commonality and Predominance. Common questions of law and fact exist as to all members of the Class and subclasses and predominate over any questions solely affecting individual members of the Class and subclasses. These questions are capable of common proof and will generate common answers that drive the resolution of this litigation. The questions of law and fact common to the Class and subclasses include:

(*The Class*)

    a.    Whether Alston & Bird structured and documented the Goliath investment program through JVAs and related instruments;

    b.    Whether those agreements created a joint venture or partnership relationship among Goliath and investor participants;

    a.    Whether Goliath and Delgado engaged in a fraudulent investment scheme;

    b.    Whether Goliath and Delgado used Alton and Bird's services to perpetrate the alleged fraud;

    c.    Whether Alston & Bird had actual knowledge of the fraudulent conduct at issue;

    d.    Whether Alston & Bird substantially assisted the fraud;

    e.    Whether Class members were damaged;

f.      Whether Alston & Bird owed duties to the joint venture and its partners, including investor participants;

g.      Whether Alston & Bird knew or reasonably should have known that the Goliath investment program constituted the offer and sale of securities under federal and state law;

h.      Whether Alston & Bird negligently or improperly opined that the investment structure did not implicate securities laws;

i.      Whether Alston & Bird knew or reasonably should have known that investors and IRA custodians would rely upon its legal work in approving and funding investments;

j.      Whether Alston & Bird's structuring advice and opinion letters enabled Goliath to solicit and obtain investor funds;

k.      Whether Alston & Bird breached duties owed to the Class;

l.      Whether Alston & Bird's conduct was a substantial factor in causing investor losses; and

m.      The appropriate measure of damages sustained by the Class.

(*JPMorgan Chase and Bank of America Subclasses*)

n.      Whether Goliath and Delgado engaged in a fraudulent investment scheme;

o.      Whether Delgado used the Goliath JPMorgan Chase account and the Goliath Bank of America account to perpetrate the alleged fraud;

p.      Whether JPMorgan Chase and Bank of America had actual knowledge of the fraudulent conduct at issue;

q.      Whether JPMorgan Chase and Bank of America substantially assisted the fraud; and

r.      Whether the JPMorgan Chase and Bank of America Subclass members were damaged as a result of JPMorgan Chase and Bank of America's conduct.

(*Coinbase Subclass*)

a.      Whether Goliath and Delgado engaged in a fraudulent investment scheme;

b.  Whether Delgado used the Goliath Coinbase account to perpetrate the alleged fraud;

c.  Whether Coinbase had actual knowledge of the fraudulent conduct at issue;

d.  Whether Coinbase substantially assisted the fraud; and

e.  Whether the Coinbase Subclass members were damaged as a result of Coinbase's conduct.

151.  Typicality. Plaintiffs' claims against Defendants are typical of the claims of the members of the Class and subclasses. Plaintiffs and Class members were all victims of the fraudulent scheme, each has claims against Defendants relating to the scheme, and each claim will depend on common proof of Defendants' wrongful conduct.

152.  Adequacy. Plaintiffs will fairly and adequately protect the interests of the members of the Class and subclasses and have retained counsel competent and experienced in class action and financial fraud litigation.

153.  Superiority. A class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each Class member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions economically feasible. Even if Class members themselves could afford such individualized litigation, the court system could not. In addition to the burden and expense of managing many actions arising from the same fraudulent scheme, individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

154.    In the alternative, the Class and subclasses may be certified because: (a) the prosecution of separate actions by the individual Class members would create a risk of inconsistent adjudications; (b) the prosecution of individual actions could result in adjudications, which as a practical matter, would be dispositive of interests of non-party Class members or which would substantially impair their ability to protect their interest; and (c) Defendants have acted or refused to act on grounds generally applicable to the Class and subclass, thereby making appropriate final and injunctive relief with respect to the members of the Class and subclasses as a whole.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### PROFESSIONAL NEGLIGENCE (LEGAL MALPRACTICE)
### (By all Plaintiffs against Alston & Bird)

155.    Plaintiffs reallege and incorporate by reference paragraphs 1-154 as if fully set forth herein.

156.    At all relevant times, Alston & Bird was a law firm engaged in the practice of law and held itself out as possessing specialized knowledge and expertise in securities regulation, investment structuring, and financial transactions.

157.    In connection with the formation and operation of the Goliath investment program, Alston & Bird undertook to structure the enterprise, draft the governing JVAs and related transactional documents, and render legal advice and opinions regarding the regulatory status of the investment structure.

158.    The services performed by Alston & Bird were not limited to internal advice to its client. Rather, Alston & Bird structured the very investment vehicle through which capital was solicited from members of the public and prepared legal instruments and opinions intended to facilitate the participation of investors in that enterprise.

159.    Alston & Bird knew, or reasonably should have known, that prospective investors and financial intermediaries—including self-directed IRA custodians—would rely upon Alston & Bird's legal work in evaluating the legitimacy and regulatory compliance of Goliath.

160.    Alston & Bird further knew that its structuring advice and legal opinions would be used to induce individuals and entities to contribute substantial capital to the enterprise through the JVAs. Alternatively, even if the enterprise ultimately did not constitute a valid joint venture or partnership, Alston & Bird created and documented the legal framework through which investors were expressly represented to occupy that role and through which their capital was solicited and deployed. In doing so, Alston & Bird knowingly placed investors in the position of relying upon the legal structure and documentation it prepared to define their rights, obligations, and legal relationship to the enterprise.

161.    Under the terms of those agreements, each capital contributor was designated a "partner" in a joint venture with Goliath. To the extent the JVAs created a joint venture or partnership under applicable law, Alston & Bird's legal services were rendered to the enterprise itself and therefore extended to its partners, including investor participants.

162.    Additionally, Alston & Bird's legal services were performed for the benefit of, and with the foreseeable and intended reliance of, the investor participants whose capital was solicited pursuant to the JVAs. Indeed, the JVAs and Defendant's related legal work were specifically designed to enable the solicitation and acceptance of investor capital and to provide legal assurances regarding the legitimacy and regulatory status of the investment structure.

163.    As a result of these circumstances, Alston & Bird owed duties of professional care to the joint venture enterprise and its investor partners, including investor participants, and/or intended beneficiaries of Alston & Bird's legal services, including Plaintiffs and members of the

34

Class. Under Florida law, attorneys may owe duties of care to intended third-party beneficiaries of their legal services even in the absence of strict privity where the legal work is undertaken for the primary purpose of benefiting or affecting those parties.

164.   Alston & Bird owed Plaintiffs and the Class a duty to exercise the degree of care, skill, diligence, and competence that reasonably prudent attorneys would exercise under similar circumstances.

165.   Among other obligations, Alston & Bird had a duty to:

a.   conduct reasonable diligence concerning the structure and operation of the investment program;

b.   ensure that the legal structure used to raise investor funds complied with applicable federal and state securities laws;

c.   accurately evaluate whether the investment structure constituted the offer and sale of securities under applicable law;

d.   avoid structuring transactions in a manner designed to circumvent investor-protection statutes;

e.   refrain from issuing legal opinions that were unsupported by the economic realities of the transaction; and

f.   warn foreseeable investors and intermediaries of material legal risks associated with the investment structure.

166.   Alston & Bird breached these duties through multiple acts and omissions, including but not limited to:

a.   structuring and documenting an investment program that, in economic substance, constituted the offer and sale of securities while representing that the structure fell outside the securities laws;

b.   preparing JVAs that mischaracterized passive investors as "partners" despite the absence of meaningful managerial control;

35

c. issuing or authorizing legal opinions suggesting that the investment structure complied with applicable law when the economic realities of the transaction indicated otherwise;

d. failing to recognize or disclose that the structure exposed investors to significant regulatory and fraud-related risks; and

e. enabling the fundraising activities of Goliath without implementing safeguards or disclosures consistent with professional standards.

167. Alston & Bird knew or reasonably should have known that its legal work would be relied upon by investors and financial intermediaries in determining whether to approve and fund investments in the enterprise.

168. Alston & Bird's conduct fell below the professional standard of care applicable to attorneys engaged in structuring investment transactions and advising on securities-law compliance.

169. Alston & Bird's negligence was a substantial factor in enabling Goliath to solicit and obtain hundreds of millions of dollars from investors under the guise of joint venture participation.

170. But for Alston & Bird's deficient structuring advice and legal opinions, the Goliath investment program could not have been marketed and sold in the manner in which it was.

171. Alston & Bird's professional negligence exposed Plaintiffs and members of the Class to an unlawful and unsupervised investment scheme that ultimately collapsed.

172. As a direct and proximate result of Alston & Bird's breaches of duty, Plaintiffs and the Class suffered substantial damages, including the loss of invested capital and other consequential financial harm.

36

173.    Plaintiffs and the Class are therefore entitled to recover all damages caused by Alston & Bird's professional negligence, together with pre-judgment interest, costs, and such other relief as the Court deems just and proper.

**SECOND CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**
**(By all Plaintiffs against Alston & Bird)**

174.    Plaintiffs reallege and incorporate by reference paragraphs 1-154 as if fully set forth herein.

175.    The JVAs governing the Goliath investment program expressly designated investor participants as "partners" in a joint venture with Goliath.

176.    Under Florida law, a joint venture constitutes a form of partnership in which the participants owe fiduciary duties to one another and to the enterprise.

177.    Alston & Bird was retained to structure, document, and provide legal validation for the Goliath joint venture enterprise, including drafting the governing JVAs and issuing legal opinions regarding the regulatory status of the investment structure.

178.    In undertaking these responsibilities, Alston & Bird provided legal services integral to the creation and operation of the joint venture itself.

179.    To the extent the JVAs created a partnership or joint venture under applicable law, Alston & Bird's legal services were rendered to the joint venture enterprise and therefore extended to its partners, including investor participants such as Plaintiffs and members of the Class.

180.    Alternatively, even if the enterprise ultimately did not constitute a valid joint venture or partnership, Alston & Bird created and documented the legal framework through which investors were expressly represented to occupy that role and through which their capital was solicited and deployed. In doing so, Alston & Bird knowingly placed investors in the position of

relying upon the legal structure and documentation it prepared to define their rights, obligations, and legal relationship to the enterprise.

181. Alston & Bird further undertook legal services that were intended to benefit, and were foreseeably relied upon by, the investor participants whose capital was solicited through the JVAs. The JVAs and related legal documentation drafted by Alston & Bird were not merely internal agreements between Goliath and its counsel; rather, they were the operative legal instruments governing investor participation in the enterprise and defining the rights and status of investor participants.

182. Alston & Bird knew, or reasonably should have known, that investors and financial intermediaries—including self-directed IRA custodians—would rely upon Alston & Bird's legal work in evaluating the legitimacy and compliance of the investment structure.

183. By structuring the enterprise, drafting the governing agreements, and issuing legal opinions designed to facilitate investor participation, Alston & Bird assumed duties to the joint venture enterprise and to its partner-investors under principles including, but not limited to, the intended third-party beneficiary doctrine and the invited-reliance doctrine.

184. Alston & Bird's conduct also created a relationship of trust and confidence between Alston & Bird and the investor participants whose rights and obligations were defined by the legal instruments Alston & Bird drafted.

185. As a result of these relationships and undertakings, Alston & Bird owed fiduciary duties to Plaintiffs and members of the Class.

186. These fiduciary duties included duties of loyalty, candor, independence, and good faith, as well as the duty to exercise reasonable professional judgment in structuring and validating the enterprise.

187.     Alston & Bird also owed duties to avoid conflicts of interest, to refrain from facilitating unlawful or misleading investment structures, and to disclose material legal risks associated with the enterprise.

188.     Alston & Bird breached its fiduciary duties through multiple acts and omissions, including but not limited to:

     a.     structuring and documenting an investment program that mischaracterized passive investors as "joint venture partners" despite the absence of meaningful managerial authority;

     b.     enabling the solicitation of investor funds through a structure that avoided the regulatory protections of federal and state securities laws;

     c.     issuing or authorizing legal opinions suggesting that the investment structure complied with applicable law despite the economic realities of the transaction;

     d.     failing to disclose material legal and structural risks inherent in the investment program;

     e.     permitting its legal work and reputation to be used as assurances of legitimacy in connection with the solicitation of investor funds; and

     f.     failing to exercise independent professional judgment in evaluating the legality and risks of the enterprise.

189.     Alston & Bird knew or reasonably should have known that its actions would enable Goliath to solicit and obtain substantial capital from investors under the guise of joint venture participation.

190.     Alston & Bird's breaches of fiduciary duty facilitated the operation of an investment scheme that ultimately resulted in the loss of hundreds of millions of dollars contributed by investors.

191.     Alston & Bird's conduct was a direct and proximate cause of the damages suffered by Plaintiffs and members of the Class.

39

192.    As a result of Alston & Bird's breaches of fiduciary duty, Plaintiffs and the Class suffered substantial financial losses, including the loss of invested capital and other consequential damages.

193.    Plaintiffs and the Class are therefore entitled to recover damages caused by Alston & Bird's breaches of fiduciary duty, together with pre-judgment interest, costs, and such other relief as the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**CONSTRUCTIVE FRAUD**
**(By all Plaintiffs against Alston & Bird)**

194.    Plaintiffs reallege and incorporate by reference paragraphs 1-154 as if fully set forth herein.

195.    At all relevant times, Alston & Bird occupied a position of trust and confidence with respect to Plaintiffs and members of the Class by virtue of Alston & Bird's role in structuring and documenting the legal framework governing the Goliath investment enterprise.

196.    As alleged above, Alston & Bird structured, drafted, and validated the Goliath joint venture enterprise, including preparing the JVAs, subscription materials, and related legal documentation governing the investment program.

197.    Through these activities, Alston & Bird provided legal services to the joint venture enterprise and undertook responsibilities that directly affected the rights and interests of the investor-partners participating in the enterprise.

198.    Alston & Bird further knew that its legal work—including the structuring of the JVAs and the issuance of legal opinions regarding the regulatory status of the investment program—would be relied upon by investors and by financial intermediaries facilitating investor participation.

199.    Alston & Bird therefore knew or reasonably should have known that investors would place trust and confidence in the legal structure and documentation Alston & Bird prepared in determining whether to participate in the investment program.

200.    In the course of structuring and documenting the investment enterprise, Alston & Bird made representations—both express and implied—regarding the legal validity, regulatory compliance, and structural integrity of the joint venture program. These representations arose not only from Alston & Bird's written legal opinions but also from the legal framework and documentation Alston & Bird drafted to govern the investment enterprise.

201.    Alston & Bird also omitted material facts concerning the risks and structural deficiencies inherent in the enterprise.

202.    Among other things, Alston & Bird failed to disclose material information including, but not limited to:

a.    the substantial risk that the investment program constituted the offer and sale of securities under federal and state law;

b.    the absence of meaningful managerial control by investor participants despite their designation as "joint venture partners";

c.    the legal and regulatory risks associated with structuring the enterprise to avoid securities registration and investor protection requirements;

d.    structural weaknesses that created foreseeable opportunities for the misuse or misappropriation of investor funds; and

e.    conflicts and risks arising from Alston & Bird's role in facilitating the investment structure while allowing its legal work to be used to assure investors of the enterprise's legitimacy.

203.    These omissions concerned material facts that a reasonable investor would have considered important in deciding whether to participate in the Goliath investment program.

204.    Alston & Bird knew or reasonably should have known that investors would rely upon the legal structure and legal opinions it provided when deciding whether to contribute capital.

205.    Plaintiffs and members of the Class reasonably relied upon Alston & Bird's structural representations, legal work, and omissions when deciding to invest in the joint venture enterprise. Such reliance was foreseeable and intended because Alston & Bird's legal work defined the investment structure through which investor participation was solicited and governed.

206.    Alston & Bird's omissions and structural representations materially misled investors regarding the legality, risks, and regulatory status of the investment program.

207.    By virtue of the trust and confidence created by Alston & Bird's role in designing and documenting the investment structure—and the foreseeable reliance of investors on that work— Alston & Bird had a duty to disclose material information necessary to ensure that investors were not misled by the structure and legal documentation it created.

208.    Alston & Bird breached that duty by failing to disclose material risks and deficiencies while permitting the enterprise to be presented to investors as a legitimate and compliant joint venture structure.

209.    Alston & Bird's conduct constituted an abuse of the position of trust and confidence it occupied with respect to Plaintiffs and the Class.

210.    Alston & Bird's actions therefore constitute constructive fraud under applicable law.

211.    Alston & Bird's constructive fraud materially misled investors and induced the contribution of substantial capital to the Goliath enterprise.

42

212. As a direct and proximate result of Alston & Bird's conduct, Plaintiffs and members of the Class suffered substantial financial losses, including the loss of invested capital and other consequential damages.

213. Plaintiffs and the Class are therefore entitled to recover damages caused by Alston & Bird's constructive fraud, together with pre-judgment interest, costs, and such other relief as the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**AIDING AND ABETTING FRAUD**
**(By all Plaintiffs Against Alston & Bird)**

214. Plaintiffs reallege and incorporate by reference paragraphs 1-154 as if fully set forth herein.

215. As set forth above, Delgado and Goliath defrauded Plaintiffs and Class members by promising them that their investment funds would be placed in liquidity pools that generated consistent returns, when in reality their money was instead used to pay existing investors and to fund Delgado's and Goliath's personal and corporate expenses.

216. Delgado and Goliath intentionally misrepresented and omitted material facts in connection with the purported investment opportunity into liquidity pools. Plaintiffs reasonably relied to their detriment on such representations and omissions by choosing to invest.

217. Alston & Bird aided and abetted Delgado's fraud and is accordingly liable for the damage caused to Plaintiffs and Class members. Alston & Bird knew of Goliath and Delgado's misrepresentations as a result of its intimate involvement in structuring, drafting, and validating the Goliath joint venture enterprise, including preparing the JVAs, subscription materials, and related legal documentation governing the investment program and gave substantial assistance to the scheme.

218.    As a result of Alston & Bird's aiding and abetting Delgado's and Goliath's fraud, Plaintiffs and Class members have been damaged in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (By all Plaintiffs Against Alston & Bird)

219.    Plaintiffs reallege and incorporate by reference paragraphs 1-154 as if fully set forth herein.

220.    Delgado and Goliath owed Plaintiffs and Class members a fiduciary duty based on the high degree of control and discretion they had over investors' money. Delgado and Goliath breached that duty by misappropriating investors' funds; instead of investing it in liquidity pools as promised, Delgado and Goliath used their money to pay existing investors and to enrich themselves.

221.    Alston & Bird knew that Delgado solicited and accepted investments and that Goliath and Delgado owed investors a fiduciary duty to act in the best interests of those investors.

222.    Alston & Bird also knew that Goliath and Delgado were breaching their fiduciary duties. As previously alleged, Alston & Bird learned of Delgado's and Goliath's breaches of fiduciary duties in the course of structuring, drafting, and validating the Goliath joint venture enterprise, including preparing the JVAs, subscription materials, and related legal documentation governing the investment program and gave substantial assistance to the breaches of fiduciary duties.

223.    Yet instead of exposing the scheme, Alston & Bird substantially assisted Delgado and Goliath in operating the scheme and in breaching their fiduciary duties to Plaintiffs and Class members.

44

224.    As a result of Alston & Bird's aiding and abetting Delgado's and Goliath's breach of their fiduciary duties, Plaintiffs and Class members have been damaged in an amount to be determined at trial.

**SIXTH CAUSE OF ACTION**
**AIDING AND ABETTING FRAUD**
**(By Plaintiffs**
**and the JPMorgan Chase Subclass Against JPMorgan Chase)**

225.    Plaintiffs reallege and incorporate by reference paragraphs 1-154 as if fully set forth herein.

226.    As set forth above, Delgado and Goliath defrauded Plaintiffs and JPMorgan Chase Subclass members by promising them that their investment funds would be placed in liquidity pools that generated consistent returns, when in reality their money was instead used to pay existing investors and to fund Delgado's and Goliath's personal and corporate expenses.

227.    Delgado and Goliath intentionally misrepresented and omitted material facts in connection with the purported investment opportunity into liquidity pools. Plaintiffs reasonably relied to their detriment on such representations and omissions by choosing to invest and depositing their money into Goliath's JPMorgan Chase account.

228.    JPMorgan Chase aided and abetted Delgado's fraud and is accordingly liable for the damage caused to Plaintiffs and JPMorgan Chase Subclass members. JPMorgan Chase knew of Delgado's fraudulent scheme as a result of performing their customer-due-diligence and anti-money laundering obligations and gave substantial assistance to the scheme.

229.    As a result of JPMorgan Chase's aiding and abetting Delgado's and Goliath's fraud, Plaintiffs and JPMorgan Chase Subclass members have been damaged in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(By Plaintiffs**
**and the JPMorgan Chase Subclass Against JPMorgan Chase)**

230.    Plaintiffs reallege and incorporate by reference paragraphs 1-154 as if fully set forth herein.

231.    Delgado and Goliath owed Plaintiffs and JPMorgan Chase Subclass members a fiduciary duty based on the high degree of control and discretion they had over investors' money. Delgado and Goliath breached that duty by misappropriating investors' funds; instead of investing it in liquidity pools as promised, Delgado and Goliath used their money to pay existing investors and to enrich themselves.

232.    JPMorgan Chase knew that Delgado solicited and accepted investments and that Goliath and Delgado owed investors a fiduciary duty to act in the best interests of those investors.

233.    JPMorgan Chase also knew that Goliath and Delgado were breaching their fiduciary duties. As previously alleged, JPMorgan Chase learned of Delgado's and Goliath's fraudulent scheme in the course of performing their customer-due-diligence and anti-money laundering obligations. Yet instead of exposing the scheme, JPMorgan Chase substantially assisted Delgado and Goliath in operating the scheme and in breaching their fiduciary duties to Plaintiffs and JPMorgan Chase Subclass members.

234.    As a result of JPMorgan Chase's aiding and abetting Delgado's and Goliath's breach of their fiduciary duties, Plaintiffs and JPMorgan Chase Subclass members have been damaged in an amount to be determined at trial.

46

**EIGHTH CAUSE OF ACTION**
**AIDING AND ABETTING FRAUD**
**(By Plaintiff Soleimani and the Bank of America Subclass**
**Against Bank of America)**

235.     Plaintiff Soleimani realleges and incorporates by reference paragraphs 1-154 as if fully set forth herein.

236.     As set forth above, Delgado and Goliath defrauded Plaintiff Soleimani and Bank of America Subclass members by promising them that their investment funds would be placed in liquidity pools that generated consistent returns, when in reality their money was instead used to pay existing investors and to fund Delgado's and Goliath's personal and corporate expenses.

237.     Delgado and Goliath intentionally misrepresented and omitted material facts in connection with the purported investment opportunity into liquidity pools. Plaintiff Soleimani reasonably relied to his detriment on such representations and omissions by choosing to invest and depositing their money into Goliath's Bank of America accounts.

238.     Bank of America aided and abetted Delgado's fraud and is accordingly liable for the damage caused to Plaintiff Soleimani and Bank of America Subclass members. Bank of America knew of Delgado's fraudulent scheme because of performing their customer-due-diligence and anti-money laundering obligations and gave substantial assistance to the scheme.

239.     As a result of Bank of America's aiding and abetting Delgado's and Goliath's fraud, Plaintiff Soleimani and Bank of America Subclass members have been damaged in an amount to be determined at trial.

**NINTH CAUSE OF ACTION**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(By Plaintiff Soleimani ] and the Bank of America Subclass**
**against Bank of America)**

240.     Plaintiff Soleimani realleges and incorporates by reference paragraphs 1-154 as if fully set forth herein.

47

241.    Delgado and Goliath owed Plaintiff Soleimani and Bank of America Subclass members a fiduciary duty based on the high degree of control and discretion they had over investors' money. Delgado and Goliath breached that duty by misappropriating investors' funds; instead of investing it in liquidity pools as promised, Delgado and Goliath used their money to pay existing investors and to enrich themselves.

242.    Bank of America knew that Delgado solicited and accepted investments and that Goliath and Delgado owed investors a fiduciary duty to act in the best interests of those investors.

243.    Bank of America also knew that Goliath and Delgado were breaching their fiduciary duties. As previously alleged, Bank of America learned of Delgado's and Goliath's fraudulent scheme in the course of performing its customer-due-diligence and anti-money laundering obligations. Yet instead of exposing the scheme, Bank of America substantially assisted Delgado and Goliath in operating the scheme and in breaching their fiduciary duties to Plaintiff Soleimani and the Bank of America Subclass members.

244.    As a result of Bank of America's aiding and abetting Delgado's and Goliath's breach of their fiduciary duties, Plaintiff Soleimani and Bank of America Subclass members have been damaged in an amount to be determined at trial.

## TENTH CAUSE OF ACTION
## AIDING AND ABETTING FRAUD
### (By Plaintiffs and the Coinbase Subclass Against Coinbase)

245.    Plaintiffs reallege and incorporate by reference paragraphs 1-154 as if fully set forth herein.

246.    Goliath, Delgado, and their co-conspirators engaged in a fraudulent scheme to solicit and obtain investor funds through material misrepresentations and omissions.

247.    Among other things, Goliath represented that investor funds would be deployed into cryptocurrency liquidity pools and trading strategies designed to generate consistent returns.

48

248.    These representations were false. In reality, Goliath operated a Ponzi scheme in which new investor funds were used to pay purported returns to earlier investors, while substantial amounts were misappropriated.

249.    Plaintiffs and Coinbase Subclass members reasonably relied on these misrepresentations in transferring funds to Goliath and suffered substantial losses as a result.

250.    Coinbase had actual knowledge of the fraudulent nature of Goliath's scheme.

251.    Coinbase maintained accounts through which Goliath received, converted, and transferred investor funds, and Coinbase had direct visibility into the transaction activity conducted through those accounts.

252.    Coinbase knowingly and substantially assisted Goliath's fraudulent scheme.

253.    As a direct and proximate result of Coinbase's conduct, Plaintiffs and the Coinbase subclass have suffered damages in an amount to be determined at trial.

## ELEVENTH CAUSE OF ACTION
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (By Plaintiffs
### and the Coinbase Subclass Against Coinbase)

254.    Plaintiffs reallege and incorporate by reference paragraphs 1-154 as if fully set forth herein.

255.    Goliath, Delgado, and their co-conspirators owed fiduciary duties to Plaintiffs and Coinbase Subclass members.

256.    By soliciting and accepting investor funds pursuant to JVAs, Goliath and its principals undertook to act on behalf of Plaintiffs and Coinbase Subclass members with respect to the management, investment, and disposition of those funds.

49

257. This relationship created duties of loyalty, care, good faith, and full disclosure, including the duty to use investor funds solely for their intended investment purposes and to refrain from self-dealing, misappropriation, and misuse of entrusted assets.

258. Goliath and its principals exercised exclusive control over investor funds once those funds were transferred pursuant to the JVAs, and investors did not retain the ability to direct, monitor, or independently verify the use of their assets.

259. In entrusting their funds to Goliath for investment and management, Plaintiffs and Coinbase subclass placed confidence in Goliath to act in their best interests, thereby creating a relationship of trust and confidence characteristic of a fiduciary relationship.

260. Goliath, Delgado, and their co-conspirators breached their fiduciary duties by, among other things:

     a.    misrepresenting the nature and use of investor funds;

     b.    failing to deploy funds into legitimate investment strategies as promised;

     c.    misappropriating investor funds for unauthorized purposes;

     d.    using new investor funds to pay purported returns to earlier investors; and

     e.    engaging in self-dealing and conduct designed to conceal the true nature of the scheme.

261. These actions constituted a wholesale breach of fiduciary obligations and resulted in substantial losses to Plaintiffs and the Coinbase Subclass members.

262. Coinbase had actual knowledge of the breaches of fiduciary duty described herein.

263. Coinbase knowingly provided substantial assistance to Goliath's breaches of fiduciary duty.

264. As a direct and proximate result of Coinbase's conduct, Plaintiffs and the Coinbase Subclass members have suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class, respectfully requests that the Court enter judgment in their favor and grant the following relief:

a.      An order certifying the proposed Class and Subclasses and appointing the undersigned counsel as class counsel;

b.      An award of damages in an amount to be determined at trial;

c.      Pre-judgment and post-judgment interest, as provided by law;

d.      An award of Plaintiffs' reasonable attorneys' fees and litigation costs; and

e.      Such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury on all issues so triable.

Date: May 15, 2026

Respectfully submitted,

*s/ Adam E. Polk*
Adam E. Polk (*pro hac vice forthcoming*)
Jordan N. Isern (*pro hac vice forthcoming*)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: 415.981.4800
apolk@girardsharp.com
jisern@girardsharp.com

*/s/Jason Kellogg*
Jeffrey C. Schneider
Fla. Bar No. 933244
Jason Kellogg
Fla. Bar No. 0578401
Victoria J. Wilson
Fla. Bar No. 92157
**LEVINE KELLOGG LEHMAN**
**SCHNEIDER + GROSSMAN LLP**
Miami Tower
100 SE 2nd Street, 36th Floor
Miami, FL 33131
Telephone: (305) 403-8788
jcs@lklsg.com
jk@lklsg.com
vjw@lklsg.com

*Counsel for Plaintiffs*

52